We have four argued cases this morning. The first one is number 23-15-52, Biswas v. DVA. Mr. Duranis. Go ahead. Good morning. My name is Herwin Duranis. I'm the counsel for the appellant petitioner in this matter, Dr. Nina Biswas. This case involves her termination in violation of the Whistleblower Protection Act from the Department of Veterans Affairs. We respectfully argue that this matter should be reversed and that the Board should be remanded back to the Board for determination of the hearing on damages. Specifically, this case involves application of the CAR Factors, the well-known CAR Factors, which I'm sure you're aware of, particularly CAR Factor 3, and failure of the agency to provide a comparator, and more specifically, the administrative judge holding that it was our failure not to have a comparator who respectfully reverses the issue and puts the burden of proof on the appellant. And that, respectfully, we argue is reversible error and that this Court should reverse it as a result of that error. You argue that the Board's decision is inconsistent with Huffman insofar as it – you argue – is the sound system not working? No, it's working. You argue that the Board's decision is contrary to Huffman. The decision in Huffman? In Whitmore. No, Huffman also. Did I say Huffman? I'm sorry. I don't recall Huffman. I recall Greenspan primarily, Smith versus GSA, and Lozano versus EPA. I'm talking about insofar as you're arguing that the Board sustained the discipline because it was appropriate to rely on the fact that she went outside of the chain of command. Oh, right. Right? Right. So that would seem perhaps to be problematic to discipline someone because of whistleblowing outside the chain of command. That's what I'm talking about. Right. That is problematic. You're right. They should not do that. You're right. Exactly. What role did that particular aspect play in the discipline? As I read the testimony of the deciding official, it seemed to play a significant role in the discipline. That's right. The fact that she had sent an email to ultimately the Secretary himself, the Secretary and Secretary at the time, played a big role in their decision to terminate her. But that email was, again, about her complaint. And again, those emails, respectfully we argue, are protected activity. She had sent them to a variety of individuals up and down the chain of command to the Director of the entire Medical Center, the Dallas VA Medical Center. And she had sent those emails up there. And they were strident. I can understand that. But she has that right, respectfully, to make that objection. And the fact that she sent that to the Secretary does not make it an automatically terminable offense. And in fact, at the hearing, it was explicitly testified that the Secretary did not direct that she be disciplined for that. He only asked that her concerns be addressed. And they replied that they had been addressed. That's a separate issue, obviously, when I hear about that. It might be wrong. It might be contrary to law to find Dr. Biswas as being insubordinate for going outside the chain of command with any protected disclosure. But I don't think that would absolve her of an aggressive, wrongful, inappropriate manner of making those kinds of communications. But respectfully, this court in the Greenspan case explicitly had that issue addressed that issue very well as well. And it did point out that, yes, whenever you're making those complaints, it's going to be upsetting. It's going to be... But Greenspan said wrongful, disruptive conduct is not shielded by the presence of protected disclosure. Well, that's right. So in that sense, Greenspan is trying to draw a distinction between the protected disclosure, the content of the communication of some kind of illegal hiring practice or something like that, and then the manner, character, nature of how that communication is undertaken by the whistleblower, the would-be whistleblower. And if it's truly inflammatory, inappropriate, unprofessional, then those sorts of things can be taken into account when evaluating the retaliation question. But again, her statements were that the hiring of Dr. Oyuga as a non-citizen was simply illegal. And I don't think that that's necessarily still highly inflammatory. She didn't use curse words or anything of that nature. But let's – I mean, if we went through the list, there's a lot of items that the A.J. here at the board looked at and saw that was highly problematic in terms of her behavior and her manner of communicating. There's the – she was accusing anyone that was responsible for hiring the non-citizen doctors to be betraying the United States government. She called her direct line supervisor a total failure in how he ran the operations. He called the way he did schedules stupid. You know, she threatened to refuse to see patients. She threatened to take unscheduled leave. I mean, there's a lot of different items here. I haven't gotten through all of them that the board went through. And then when I look at page 821 of the board's final analysis, he was looking at all of this and saying this is highly inappropriate, disruptive, creating a hostile work environment, unprofessional, improper acts. And that analysis at the end of the opinion isn't talking about the emails to General Shinseki and isn't focusing on the alleged insubordination for going outside the chain of command. And under circumstances like this, what I'm wondering is if the harmless error principle applies here, that even if there's a – I understand. Let me finish. Even if, you know, we take away the insubordination for making a communication outside the chain of command finding, there's still other forms of insubordination. For example, the instruction to stop sending inflammatory, unprofessional emails, distributing them widely, and all this other conduct that could all by itself be rolled up and said even if there is a legal error as to one piece of all of this record, there's still more than enough for satisfying carbacter one that there is very strong evidence to support the action that the agency took care of. Now go ahead and respond. No, I understand your point, Your Honor. And it's a good point. I'm not here to totally defend everything she's done. She may have been inappropriate in some respects. But I do argue respectfully that the agency has not yet demonstrated exactly why those are specifically terminable offenses. As I argued previously in my brief, it's not enough to simply list a terrible bunch of bad acts. Do you think there's substantial evidence in the record to support the AJA's finding that Dr. P. Suase's communications and conduct created a hostile work environment for other doctors? No. No other doctor came and testified to such an event. Well, we have something on record that's not live testimony, at least statements or declarations from people like Dr. Gupta and at least one other doctor, that said this was extremely offensive what she was communicating widely about them. And this kind of nationalistic rhetoric that she's distributing against them made it not only offensive but created a hostile work environment. And that was the kind of evidence that the AJA relied on to say this was a hostile work environment. Respectfully, her complaints were specifically with respect to Dr. Gupta was at the time he was a foreign national. And she was arguing that the agency was not properly complying with the law to hire first and foremost only if they were qualified U.S. citizens and then only secondarily to come in there. Dr. Gupta may have found that offensive. Respectfully, that's not relevant. Why isn't it relevant? I mean, she's allowed to make protective disclosures and can't be punished for them. But she's not allowed to make them in unprofessional, threatening or hostile ways. Right. You would agree with that, wouldn't you? Certainly. But I don't think she made it in a threatening way. I don't see any threats. But that's a factual finding that the board made. And we're reviewing that for substantial evidence. You're not going to do any good here re-arguing the evidence on that. No, I'm not going to. There's a whole list of things, as Judge Chen correctly pointed out, pages 21 through 23 of the board's decision listing all of these things that the agency found unprofessional and hostile and demeaning and the like. And that's evidence we have to support that finding. Why isn't that the end of the game on this point? Because, again, I don't think – for two factors. One, I don't think the agency produced anybody to show that it wasn't specifically a terminable offense. They just said that it – the conclusory stated that they were. They made these conclusory statements respectfully. Wait a minute. I'm a little confused about this because she doesn't have civil service protections to the extent that they have to have a cause for her termination, right? She was a temporary appointment. So she can be – you know, you're making a lot of faces at the podium. It's really inappropriate. I apologize. She can be terminated for no reason whatsoever if she doesn't have civil service protections. You brought a whistleblower claim. So then they have to go through all these reasons of why they would have taken the action, which is ending her temporary appointment. But they don't – it's not – it doesn't convert it into some kind of forecast standard. It just means they would have ended her temporary appointment without the disclosures. And so I don't understand why you keep saying this wasn't a terminable offense. This is not the world we're operating in, in a temporary appointment in an IRA appeal. So whether – they have to show that this was good enough reason to terminate her appointment during her term appointment. Not whether that would have a rise to a level of a terminable offense under the regular Title V, Chapter 75 procedures. Right. Well, as a VA physician, she's not under Title V at all. Right, right. But you know what I mean. It's the same thing. I mean, it's very similar to the same thing. But at the time of her protective disclosure, she was – remember, she had been initially converted to a permanent employee. Well, that's a different issue. The agency explained why that was a mistake and they converted her back. And if you want to challenge that, you can. But I don't see any kind of light of day on that because I think the agency didn't just convert her back. It also converted some other people back that it improperly converted to a permanent thing. So I don't think you can single out the agency's actions on that. Well, I understand. But all of those other doctors were converted back and given professional standards awards. And again, the appellants – They were converted back to – after they were improperly converted to a permanent appointment without a board, they were converted back to a temporary appointment. And then converted back to permanent. The issue is not whether the conversion was improper because that was based, as I read it solely, on the fact that giving her the permanent status in the first place was illegal. So we're talking not about that aspect of the case but about the termination. She can't be terminated for engaging in protected whistleblowing. And it is true that there are a variety of reasons that were given here, but it does seem as though a central reason was the going outside of chain of command. And so it's hard to separate that from the overall result given the way the board approached this, sustaining the chain of command ground. You are correct, Your Honor. It is difficult to do that. But I think respectfully that we do argue that, again, the agency still has not demonstrated precisely why she has done that. It's just because she went outside the chain of command. Again, you're right. That is the whole thing in Huffman as I made it in there. And the administrative judge specifically found that these protected disclosures were made outside the chain of command and that they were, quote, disruptive to the work environment. I don't think respectfully, though, that there's any substantial evidence that it was disruptive to the work environment. She's a doctor. She performed all of her doctor's duties. Well, I'm not sure that's the issue. I mean, there may be substantial evidence that would support a removal, but if the ground is based on improper theory, even if there was substantial evidence to support it under some other theory, I'm not sure that we can sustain what happened here. But maybe you want to save the rest of your time for rebuttal. Well, I understand. And I do want to save some time for rebuttal, but I do want to emphasize once again that the administrative judge explicitly did put the third car factor burden on us, and that reverses the basic standard of proof. And at a minimum, it should be remanded for that reconsideration, if not totally reversed. Again, the third car factor is still on the agency's burden, not the appellant. On the last page of his decision, on appendix page 24, he found that since we did not produce a similar situation to the employees who was not a whistleblower or treated more favorably, that was one of his key factors, and that respectfully is wrong. And at a bare minimum, this court should release remanded, if not totally reversed, for that determination. I don't think, again, respectfully, that this court should ever simply accept the litany of bad acts without the evidence that it was actually all of these were terminable offenses, or together they were terminable offenses. I'm going to have to use my time up. I will give you two minutes for rebuttal. I think I've done that. But I've got five minutes for rebuttal, right? No, you used all your rebuttal time. He said he would give you two minutes back. Oh, I'm sorry. I think that you should sit down. I should sit down. Okay. Ms. Westerkamp. Good morning, and may it please the Court. I think just to briefly address... You've got a problem here because it is correct that you can't terminate somebody, even a probationary employee, for engaging in protected whistleblowing. And protected whistleblowing includes going outside the chain of command, correct? Yes, it does. Okay. So to the extent that the deciding official here was relying on the fact that she went outside the chain of command, that's not a valid ground for termination, right? But I disagree, Your Honor. No, no. Answer the question. No. To answer your question, no, you cannot. If a whistleblower goes outside the chain of command, that should not be a basis for termination. And the deciding official and the Board relied on that in part, right? I would say in part, yes. Okay. So the suggestion is that maybe that error was harmless because there was other evidence to support it, which there appears to be. But the problem is the chain of command ground seems to be somewhat central here. If you look at page 240 of the appendix on page 577, you see that the deciding official is relying heavily on the fact that she went to Shinseki outside the chain of command. Well, but I would argue that all of the e-mails that Dr. Biswa sent and copied Secretary Shinseki on, that all happened after the confrontation in July 2012 with Dr. Oyula, where it was unprecedented where Dr. Holt, who was the acting chief of staff of a 4,400-member hospital at the Dallas VA, had to intervene and order Dr. Biswa to do her patient rotation that day, and also Dr. Goodman. I'm not understanding what your point is. I mean, there surely is evidence here which would support a termination, evidence which is unrelated to protected whistleblowing. But the question is, since there is reliance here on protected whistleblowing and discharging her, whether that infects the decision so that we have to send it back. And I don't think it does infect the decision, Your Honor, where I would point to the Greenspan case where that did say that wrongful or disruptive conduct is not shielded by the presence of a protected disclosure, as well as the Khalil case, and that's 479 F3-821, where, again, the character of the disclosure itself can provide clear and convincing evidence that the agency met its burden. And finally, Petiolos, which is 479 F Appendix 341, where that was the same kind of thing, where the employee sent rude and disrespectful e-mails. Okay, but were the e-mails that went to Shinseki rude and disrespectful? Maybe you can show us which ones. You know, I've read those e-mails. It seems to me that many of them are not disrespectful. So, yes, they were, Your Honor, where, for example, on page, the appendix at 627, the subject is poor staffing, horrible leadership, and this is an e-mail from Dr. Biswas directly to Dr. Gutenberger, who was the hospitalist chief. And she copies Secretary Shinseki on this, and, for example, and it's the third full paragraph down, she says, Dr. Oyula has played a nice game, and it looks like he is your boss at this time in getting what he wants. You were totally manipulated and played to his whims. It is totally obvious to all in the group that he has failed as a leader a long time ago, continues to jeopardize the hospitalist program. And then that was not the only e-mail that Secretary Shinseki was copying on. Further in, this is at the appendix, page 1247, and this is, again, she'd been instructed for a guest counsel to go through Dr. Gutenberger, and if she's got complaints about the federal hiring practices, then she should also go to the OIG. But she, again, e-mailed Secretary Shinseki on that date and was, again, complaining about the hiring of Dr. Oyula, where she said, we have lost, and this is on page 1248, where we have lost a lot of good citizen physicians due to dirty politics and open workplace violations. And, again, this was something where, further down, she acknowledges receipt of the memo that was distributed to all staff on December 11, 2011, about the grievance process. And this was something where her e-mails were rude and inflammatory, and I would point to that. Do you think that the administrative judge relied on this simple going outside the chain of command to find the clear and convincing evidence, or did he just acknowledge that that existed, which is what made the case out for the nexus between her disclosure and the conduct with the date? He relied on other, the inflammatory nature of the e-mails and the disruptive conduct as the clear and convincing evidence. I think it's the latter, Your Honor. What's your best point in the decision for that? Well, so on pages 14 through 24 is the board's decision, where he did go through the various misconduct by Dr. Biswas. And when it came to looking at exactly what the board had said, this was at the appendix, pages 19 through 20 of the board's decision, where the agency clearly, quote, clearly and convincingly showed that Ms. Biswas' appointment was terminated due to her disruptive and insubordinate conduct and not due to her whistleblowing. And that also, on pages 21 through 22, where, quote, the board found that the agency convincingly showed that Dr. Biswas was engaged in other unprofessional and improper acts following her non-selection for the hospitalist section chief position with the various e-mails she sent. Well, but the problem is that the administrative judge is relying heavily on going outside of the chain of command as itself an independent and appropriate theory for her termination. But I think, Your Honor, just as Judge Hughes has pointed out, at the time Dr. Biswas was a temporary employee, and so her termination letter is at page 16. Wait, what does that have to do with it? Well, so what it has to do with it is because she didn't have, I guess, the so-called vested MSPB rights. There didn't have to be a full explanation. I don't understand what you're saying. The question we're dealing with is whether they relied, the HA relied on her going outside the chain of command, quite apart from the tenor of some of the e-mails that she might have sent. But I think, and the passages I quoted from earlier, I think that this is something where some of the e-mails just happened to be copying Secretary Shinseki, but a lot of the inflammatory e-mails did not. So, for example, even the Dr. Gupta e-mails were. But what we're asking you is to look at the AHA's decision and see what grounds were articulated there for sustaining the discipline. And the way I read it, she repeatedly relies on going outside of the chain of command, separate from the inflammatory nature of some of the e-mails. Well, and that may be true, but that also does not undermine the fact that there was other misconduct over the course of several months. Basically, as soon as she was not selected for Dr. Ayula's position, from May through roughly September, she was just kind of waging a campaign against her non-selection. I guess the question that the court is struggling with is trying to understand this board decision. Some of it looks compelling, but at least one piece of the reasoning looks legally wrong. And now we have to figure out what was really the focus of the board's reasoning and whether the finding that it was insubordinate to e-mail outside the chain of command to General Shinseki, a protected disclosure, a cornerstone of the board's reasoning. And then after we figure that out, we have to ask ourselves how does the harmless error principle work in the context of this case? What is the lens we have to look through to try to figure out, once we take away what we think is inappropriate reasoning, whether the remaining legitimate reasoning is good enough to give us sufficient confidence under the law that whatever error that happened is actually just harmless in this context? Well, I would say in response to that, Your Honor, that the board found credible Dr. Gutenberger's testimony, that the thought of removal only crossed his mind after that July 2012 confrontation that Dr. Biswas had with Dr. Ayula, and that any of her e-mails after that was that Shinseki came after that. How about, I'm sorry, maybe let me try again. What is your understanding of the rule for harmless error? What is the legal framework we apply to trying to figure out here whether the reasoning that the e-mails to Shinseki were insubordination, and we have to take that away? Well, with harmless error, just essentially that it would not infect, I guess, the decision, and that there could be other grounds for it, or that even so, that even with that error, it does not affect the ultimate decision. And here, I do agree that the board did point out that some of the e-mails were copied or sent directly to Secretary Shinseki, except at the same time, most of the e-mails were not, with Secretary Shinseki copied, and it was to all of the hospitalists that were working there, it was to everybody in HR. She was sending her complaints just, I guess, pell-mell, and just the whole kitchen sink to everybody. And so while I acknowledge that there were some Secretary Shinseki e-mails and that the board did say that insubordination outside the chain of command, I don't know if it was the testimony of Dr. Holtz and Dr. Gutenberger, which again, this court can't reweigh the board's consideration of that, but that their testimony was that she was creating a disruptive and hostile work environment. Yeah, but there's also testimony, if you look at page 240 of the appendix, where he, our supervising official, seems to say that it was the sending of the latest salvo to Shinseki that made it time for her to go, even at the cost of hardship. So this is at 577 at the top. So, I mean, it seems to have played, this is not something peripheral. It seems to have been a central aspect of the decision to terminate her. It may be that there are other grounds that would support, on a remand, that would support affirming the discipline, but if the decision of the HA rests on an improper ground, there has to be some determination of whether the other proper grounds were sufficient in and of themselves for the termination. Well, and I would point the court, not the board, to the appendix 653, where this is an email from Dr. Gutenberger to HR personnel, where it's the subject's outline for inclusion and letter of termination. And of that, there are four points, and the top one is insubordination for failure to follow chain of command. But then the other three are insubordination, so to cease inflammatory emails about colleagues, insubordination, refusing patient assignments, and hostile work environment. And so I think you have testimony from Dr. Holtz and Dr. Gutenberger, and this is back when they believed she was a permanent employee and they had to follow a different process. And so I think, although the board may have put several times in its opinion that insubordination for outside chain of command, even the agency, back when it believed she was permanent, had insubordination for outside chain of command as just one small element. One small element? How do we know it's small? I don't see the record supports the notion that it's small. Well, but I guess in the sense that if there's four points for her removal, it's one of four. And again— How did we get where we are now? I mean, was the VA arguing to the board that going outside the chain of command was improper and could support discipline? Because if that's what the VA argued, that's just wrong. You shouldn't be arguing that. I think it was part of the fact that she had been counseled to follow the proper process. There's no proper process. The heart of the Whistleblower Protection Act is to protect people who go outside the chain of command. It's designed to encourage that and protect it. So that can't be a ground for firing somebody. And again, that's where the case law is on our side, with Khalil, for example, Greenspan, and Petialos, where even if you're going outside the chain of command, it's the content of the emails that matter too. And in this case, even the quotes that I mentioned earlier with the Secretary Shinseki emails were pretty defamatory, where if you're accusing your supervisor, Dr. Gutenberger, of lining his pockets or just improper conduct, that goes to she can't just say that because I can report this to anybody, the entire content of my emails are protected. And that's what those cases say. And so I think that considering all of that, and with her other misconduct that was escalating, frankly, that the I don't think anybody's suggesting that there wasn't sufficient evidence to sustain the termination here. The question is whether it also rested significantly on improper considerations. And with that being the chain of command, and I would submit that although that may have been a part of the Board's decision, that wasn't the central holding. And if, for example, the Board had said, the agency showed me by clear and convincing evidence that she should be removed because she emailed Secretary Shinseki, we would have a problem. But that's not what the Board said. That was just a part of the Board's explanation of the various disruptive behaviors Dr. Biswas committed over the course of several months. So is the framework, let's take away the Shinseki emails from the case entirely, and then the question that's left is, does substantial evidence nevertheless support the ruling? For this Court, the review is substantial evidence, and I would argue that. But in terms of harmless error, I'm trying to now, I mean, I keep asking about what is the way to analyze harmless error. And so let me just put it to you. Is it where we take away the Shinseki emails from the basket of things the Board considered and then ask ourselves, is there still substantial evidence? Or maybe it's slightly different that would the AJ have reached the same outcome? I mean, I think it's the former where if you excise out any of the chain of command analysis, is there still enough in there with substantial evidence to support the Board's decision? No, that can't be right. That's not. I mean, it seems like it's a two-part thing. At least initially we have to ask ourselves, would the AJ have done the exact same thing? And then second, do we think substantial evidence supports that same thing under the circumstances? Then we return to our traditional analysis of substantial evidence. It seems like there's a threshold question first in terms of harmless error. And I think that very well could be the case. And at least on this record, at least there is substantial testimony that the Board had considered and that was outside of the chain of command question, as well as plenty of documents for the Court to also look at what the Board had considered. And I know I'm out of time, but if there are any further questions. I think we're done. Thank you. Thank you. Mr. Doremus, I gave you two minutes. Thank you, Your Honor. I think you raised a very good point, Judge Chen, as to the standard of harmless error and why it becomes a harmless error. I don't know exactly how the administrative judge would rule. I don't know if I can answer that respectfully, or anybody can. I think that's why it probably should be remanded back to the administrative judge at a bare minimum for determination to use the proper factors, and as well as I argued previously, not to use the car factor as a sword against the appellant, but it's only a shield for the appellant. That is when he specifically found on Appendix Page 24 that we had not provided the proper comparator for her. That's respectfully not the standard for the third car factor. It's whether the agency did. Ultimately, as I've stated many times... The agency said there aren't any proper comparators because her conduct is different than everybody else. So what's wrong with that? Well, that's right, and this court has ruled in the Whitmore case that I've cited in the Air Department of Labor case that you don't have to provide comparators necessarily, but they do so at their caution. And if there is not a proper comparator, then that factor has to be neutral. It can't be used against the appellant. It must be a neutral factor. In this case, the administrative judge has explicitly stated that we didn't provide a comparator, and that, respectfully, is error. So I think you've got two major errors here, respectfully, and that's where I think you go beyond that it's just simply it isn't harmless error. It must be at least remanded for that determination on that factors. Okay, anything else? No, I guess I'm done 26 seconds early. Thank you, Your Honors. I appreciate it. Okay, thank you. Thank both counsel. The case is submitted.